779 So.2d 198 (2000)
COURTAULDS FIBERS, INC.
v.
Horace L. LONG, Jr., et al.
Horace L. Long, Jr., et al.
v.
Courtaulds Fibers, Inc.
1971996 and 1972028.
Supreme Court of Alabama.
September 15, 2000.
*199 Wesley Pipes, Cooper C. Thurber, and William E. Shreve, Jr., of Lyons, Pipes & Cook, P.C., Mobile; and C.C. Torbert, Jr., of Maynard, Cooper & Gale, P.C., Montgomery, for appellant/cross appellee Courtaulds Fibers, Inc.
Christopher E. Peters, Charles S. Willoughby, J. Keith Givens, and J. Farrest Taylor of Cherry, Givens, Peters & Lockett, P.C., Mobile, for appellees/cross appellants Horace L. Long, Jr., et al.
Joseph P.H. Babington of Helmsing, Sims & Leach, P.C., Mobile; Rhonda Pitts Chambers of Rives & Peterson, P.C., Birmingham; and Charles A. Stewart III of Sirote & Permutt, P.C., Montgomery, for amicus curiae Alabama Defense Lawyers Association.
PER CURIAM.
Horace L. Long, Jr., and Margaret Long sued Courtaulds Fibers, Inc., alleging that it had released carbon disulfide (CS2) into the air, soil, and water during its manufacturing process and seeking damages based on harm they claimed to have incurred as a result of Courtaulds's actions. The Longs alleged nuisance, trespass, negligence, wantonness, and emission of an abnormally dangerous instrumentality. They sought to represent a class, and they sought both compensatory and punitive damages. Courtaulds moved for a judgment as a matter of law ("JML") on all claims, at the close of the plaintiffs' case. The trial court entered a JML as to the claims alleging wantonness and emission of an abnormally dangerous instrumentality; as to the class action claims; and as to the claim seeking punitive damages. It denied the motion as to the remaining claims. Courtaulds again moved for a judgment as a matter of law on the three remaining claims at the close of all the evidence. The court denied Courtaulds's motion and submitted the nuisance, trespass, and negligence claims to a jury; the jury returned a general verdict awarding the plaintiffs $1 million. The court entered a judgment on the jury's verdict. Courtaulds appealed. The plaintiffs cross-appealed, arguing that the trial court erred in entering the JML on their claim for punitive damages. On the appeal, we reverse and remand; we dismiss the cross-appeal.
In or about 1952, Courtaulds began manufacturing rayon fabric at its Axis, Alabama, plant. In the manufacture of this fabric, Courtaulds uses CS2, which has been designated by the Federal Government as a hazardous material. See 42 U.S.C. § 7412(b)(1). Some amount of CS2 is released into the environment during *200 Courtaulds's production of rayon. In the 1960s, Mr. Long came into possession of a tract of land in Creola, Alabama, that is located approximately three to four miles from Courtaulds's Axis plant. In 1985, he began to keep horses on a portion of this land; in 1988 he married and he and Mrs. Long moved into a house he had built on the property. Mr. Long contended at trial that he noticed the smell of CS2 before 1987, and that beginning in that year the smell became a problem for him. Specifically, he complains that it caused a burning sensation in his nose and throat and prevented him from enjoying the use of his property.
In 1991, the Longs noticed that the horses they kept on the property were beginning to lose weight and to have difficulty breathing. They had the horses examined by a number of veterinarians. Two of these horses died, and the Longs presented expert testimony at trial indicating that they had died as a result of exposure to a toxic substance. One veterinarian, Dr. Frederick W. Oehme, testified that he believed the CS2 caused the illness and death of the horses.
In addition to the testimony concerning the damage or loss they claimed to have sustained as a result of the illnesses contracted by their horses, the Longs also offered testimony indicating that the value of the land had decreased by approximately $3 million because of the known presence of CS2.
Courtaulds presents five issues on appeal: (1) whether the trial court erred in denying its motion for a JML on the Longs' nuisance claim; (2) whether the trial court erred in denying its motion for a JML on the Longs' trespass claim; (3) whether the trial court erred in denying its motion in limine to exclude testimony from the Longs' veterinary toxicologist expert; (4) whether the trial court erred in denying its motion for a JML on the Longs' claim of damages for mental anguish; and (5) whether the trial court erred in denying its motion for a new trial. In their cross-appeal, the Longs contend the trial court erred in entering a JML on their claim for punitive damages.

Nuisance
In its motion for a JML made at the close of all the evidence, Courtaulds challenged, with specificity, the sufficiency of the evidence to support the nuisance claim. In Aspinwall v. Gowens, 405 So.2d 134, 138 (Ala.1981), this Court held:
"[I]f a complaint has more than one count and the defendant believes that the evidence is not sufficient to support one or more of those counts, he must challenge this by motion for directed verdict [Rule 50, Ala.R.Civ.P., as amended in 1995, renamed the `motion for a directed verdict' as a `motion for a judgment as a matter of law'], specifying the count which is not supported by evidence and detailing with specificity the grounds upon which the particular count is not supported by the evidence. If this is not done and all counts go to the jury and a general verdict is returned, the court will presume that the verdict was returned on a valid count."
However, if the defendant makes the specific objection, then this Court will not assume that the verdict was returned on a valid claim or count and will reverse for a new trial on the valid claims or counts. AALAR, Ltd., Inc. v. Francis, 716 So.2d 1141, 1149 (Ala.1998).
Courtaulds's motion for a JML made at the close of the plaintiffs' case and its motion for a JML made at the close of all the evidence both contain the following paragraph:
"15. Defendant's plant had been in operation for more than one year before conditions changed in and about the locality thereof. Defendant's plant was not a nuisance at the time the operation thereof began [1952]. There is no legally sufficient evidentiary basis for a reasonable jury to find that the alleged nuisance results from negligent or improper operation of defendant's plant. *201 Therefore, plaintiffs' nuisance claim is barred by Ala.Code [1975,] § 6-5-127(a) (1993)."
The Longs contend that the evidence indicating that the defendant had failed to use "carbon-bed-absorption" recovery technology was substantial evidence indicating that the defendant had negligently or improperly operated its plant. However, the record contains no evidence indicating that the defendant violated its permit from the Alabama Department of Environmental Management ("ADEM"). In addition, during the period 1993-97, the defendant installed improved rayon-spinning machines; the installation of these machines increased the rate of CS2 recovery and substantially reduced emissions.
The Longs also argue that carbon bed absorption is the industry practice in the United States, and, therefore, that Courtaulds acted negligently by not following that practice. Even if a jury can consider industry practice as evidence of a duty, the breach of which would constitute negligence, the record contains no evidence indicating that carbon bed absorption is the industry practice. The record does contain evidence indicating that the defendant's indirect parent company, Courtaulds PLC, used carbon bed absorption in its plants in Europe. Certainly, this fact aloneand that is all that is before us in regard to this argumentdoes not constitute substantial evidence indicating that the defendant was negligent in failing to retrofit its Axis plant with carbon-bedabsorption technology. The plaintiffs presented no expert testimony on this issue, and they presented no testimony indicating the defendant breached any standard or acted unreasonably by not installing carbon-bed-absorption technology in the Axis plant.
We will not assume negligence; we will not assume improper operation. Ala. Code 1975, § 6-5-127(a), provides:
"No ... manufacturing or other industrial plant or establishment ... shall be or become a nuisance, private or public, by any changed conditions in and about the locality thereof after the same has been in operation for more than one year when such plant, facility, or establishment, its appurtenances or the operation thereof was not a nuisance at the time the operation thereof began [no evidence in the record indicates the defendant's plant was a nuisance in 1952]; provided, that the provisions of this subsection shall not apply whenever a nuisance results from the negligent or improper operation of any such plant...."
Given the provisions of this statute, to support the verdict in this case the plaintiffs had to present substantial evidence of "negligent or improper operation of [Courtaulds's] plant." The record contains no substantial evidence indicating "negligent or improper operation." Thus, § 6-5-127(a) bars the plaintiffs' nuisance claim. The trial court erred in denying Courtaulds's motion for a JML on that claim.
Furthermore, because in its JML motion Courtaulds specified the particular reasons the plaintiffs could not recover on the negligence and nuisance claims, we cannot assume that the jury's general verdict was returned on a valid claim or count in the complaint. Therefore, we must reverse for a new trial on the valid remaining claims. AALAR, 716 So.2d at 1149.
As shown above, the nuisance and negligence claims were not supported by substantial evidence, but we conclude that the plaintiffs did present sufficient evidence for the court to submit the trespass claim to the jury. Therefore, we reverse the judgment of the trial court and remand the cause for a new trial on only the trespass claim.
Because we remand this case for a new trial, we do not reach the issues concerning the plaintiffs' claim for mental-anguish damages, and we do not consider Courtaulds's motion for a new trial based on an allegation of jury tampering. However, an evidentiary issue raised by Courtaulds will *202 be pertinent to the new trial; therefore, we will answer that issue now.
Courtaulds argues that the testimony of the Longs' expert, Dr. Oehme, is insufficient under the standard announced in Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), and therefore, it argues, the Longs presented no admissible expert testimony to prove that CS2 caused the death of their horses. Courtaulds bases its argument on the assumption that this Court has adopted the Daubert standard in civil cases. However, this Court has not abandoned the "general acceptance" test stated in Frye v. United States, 293 F. 1013, 1014 (D.C.Cir.1923), and it has not adopted the Daubert standard in civil cases. Southern Energy Homes, Inc. v. Washington, 774 So.2d 505 (Ala.2000). See also Advisory Committee Notes to Rule 702, Ala.R.Evid., and Charles W. Gamble, McElroy's Alabama Evidence § 127.02(4) (5th ed.1996).[1]
Courtaulds objects to Dr. Oehme's testimony because he has no scientific literature to support his opinions. Because he has no scientific literature to support his opinions, Courtaulds claims there was "no valid scientific basis" for his opinions and the testimony is therefore inadmissible under Daubert. However, neither the Frye test nor the Daubert standard applies to Dr. Oehme's testimony. Instead, this issue is controlled by Rule 702, Ala.R.Evid., which provides:
"If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise."
Rule 702 does not require an expert to have scientific literature to support his or her opinion. Indeed, a reading of Rule 702 shows a clear rejection of such a narrow interpretation"a witness qualified as an expert by knowledge, skill, experience, training, or education" may give testimony thereto "in the form of an opinion." (Emphasis added.) See also McElroy's Alabama Evidence, supra, § 127.02(4) and (5). The narrow interpretation of Rule 702 advocated by Courtaulds would bar physicians from testifying about a differential diagnosisa diagnosis based upon ruling out all other causes. See Baker v. Dalkon Shield Claimants Trust, 156 F.3d 248 (1st Cir.1998), and In re Paoli R.R. Yard PCB Litigation, 35 F.3d 717 (3d Cir.1994), cert. denied, 513 U.S. 1190, 115 S.Ct. 1253, 131 L.Ed.2d 134 (1995).
Dr. Oehme's opinions derive from knowledge, skill, and training he has received through his years of experience. This is all that is required under Rule 702. Therefore, we cannot say that the trial court abused its discretion in admitting the testimony of Dr. Oehme.
We reverse the judgment of the trial court and remand the case for a new trial on the trespass claim. Because of this holding, we see no reason to address the Longs' cross-appeal. Therefore, the cross-appeal is dismissed.
1971996REVERSED AND REMANDED.
1972028DISMISSED.
HOOPER, C.J., and MADDOX, HOUSTON, SEE, BROWN, and ENGLAND, JJ., concur.
*203 COOK, J., concurs in part and dissents in part.
JOHNSTONE, J., concurs in part and dissents in part as to the opinion and dissents as to the judgment in case no. 1971996.
LYONS, J., recuses himself.
COOK, Justice (concurring in part and dissenting in part).
The main opinion holds that the trial court properly submitted the plaintiffs' trespass claim to the jury. To the extent of that holding, I concur. Paradoxically, however, the main opinion also holds that the trial court erred in submitting the nuisance claim to the jury.
In Borland v. Sanders Lead Co., 369 So.2d 523 (Ala.1979), this Court stated:
"Whether an invasion of a property interest is a trespass or a nuisance does not depend upon whether the intruding agent is `tangible' or `intangible.' Instead, an analysis must be made to determine the interest interfered with. If the intrusion interferes with the right to exclusive possession of property, the law of trespass applies. If the intrusion is to the interest in use and enjoyment of property, the law of nuisance applies."
Id. at 529. More specifically to my point, this Court explained that "conduct which rises to the level of trespass to land, generally speaking, [will] support a nuisance action." Id. n. 1 (emphasis added). This case is no exception to that rule.
In Alabama, a "nuisance" is defined as "anything that works hurt, inconvenience or damage to another," and "[t]he fact that the act done may otherwise be lawful does not keep it from being a nuisance." Ala. Code 1975, § 6-5-120. In other words, an Alabama manufacturer owes a duty to neighboring landowners to use its property in a manner that will not "work[ ] hurt, inconvenience or damage" to them.
In support of its holding, the main opinion cites Ala.Code 1975, § 6-5-127(a), which provides:
"No agricultural, manufacturing or other industrial plant or establishment, or any farming operation facility, any of its appurtenances or the operation thereof shall be or become a nuisance, private or public, by any changed conditions in and about the locality thereof after the same has been in operation for more than one year when such plant, facility, or establishment, its appurtenances or the operation thereof was not a nuisance at the time the operation thereof began; provided, that the provisions of this subsection shall not apply whenever a nuisance results from the negligent or improper operation of any such plant...."
(Emphasis added.)
The operative language here is "when... the operation thereof was not a nuisance at the time the operation thereof began." (Emphasis added.) Clearly, the Legislature did not intend to confer absolute immunity. This clause limits the scope of immunity provided to the operator of a manufacturing facility whose emissions level reasonably corresponds to the level that existed "at the time the operation [of the facility] began." In other words, if the emissions level of an industrial plant rises over the life of the plant so as to constitute a manifold increase over the emissions level that existed "at the time the operation ... began," the section will not insulate the operator from liability.
Section 6-5-127(a) is, therefore, consistent with the rules governing prescriptive nuisances. The right to maintain a private nuisance by prescription may be acquired, but only if, among other things, the use remains uniform. "To acquire the right to maintain a private nuisance by prescription, the nuisance must have been maintained in substantially the same manner and with equally injurious results throughout the entire prescriptive period; if the nuisance is of progressive character, there can be no acquisition of prescriptive right." Cook Indus., Inc. v. Carlson, 334 *204 F.Supp. 809, 818 (N.D.Miss.1971) (emphasis added). See also Stouts Mountain Coal & Coke Co. v. Ballard, 195 Ala. 283, 287-88, 70 So. 172, 174 (1915) (an invasion that is not "injurious or destructive to the owner[ ] will not authorize ... tacking to that period succeeding years in which the burdens upon the owner were increased or enlarged to the extent of producing injury or destruction, although the method of ... producing the result may be the same"); Schmidt v. Village of Mapleview, 293 Minn. 106, 108, 196 N.W.2d 626, 628 (1972) ("the right to acquire such a prescriptive [nuisance] is dependent upon its maintenance in substantially the same manner and with equally injurious result for the period required by the statute"). The Longs presented substantial evidence of such an increase in emissions as would defeat the claim of a prescriptive right.
Indeed, it is undisputed that the emissions level at Courtaulds's plant increased from 30,000,000 pounds of carbon disulfide in 1986, to slightly less than 40,000,000 pounds in 1997, an increase of approximately 10,000,000 pounds annually. For one year in the 1990s, the emissions level reached 45,500,000 pounds. There was testimony that at the 1986 emissions level, the odor was "not a problem" on the Longs' property, but that, at the much higher levels produced in the mid 1990s, the smell was strong enough to irritate the nose and throat. There was testimony that, at these levels, the smell was occasionally strong enough to force the Longs temporarily to vacate their property.
Under these facts, § 6-5-127(a) does not immunize Courtaulds. Thus, the jury was entitled to find that Courtaulds had created and maintained a nuisance. I, therefore, respectfully dissent from that portion of the main opinion holding that the trial court erred in submitting the nuisance claim to the jury.
JOHNSTONE, J., concurs.
JOHNSTONE, Justice (concurring in part and dissenting in part as to the opinion and dissenting as to the judgment in case no. 1971996).
I concur with the holdings in the main opinion that the Longs presented substantial evidence supporting their trespass claim and that the trial court did not abuse its discretion in admitting the testimony of the Longs' expert, Dr. Oehme. However, because I respectfully dissent from the holdings that the Longs failed to produce substantial evidence to support their nuisance and negligence claims, I dissent from the reversal of the judgment of the trial court.
In the 1960s, Horace L. ("Buddy") Long, Jr., inherited over 900 acres of land in Creola, Mobile County, Alabama. Beginning in 1985, Buddy began keeping seven or eight horses on the property. In 1986, Courtaulds emitted 30,000,000 pounds of CS2. Buddy did not live on the property until approximately 1987, when he built a house there. Buddy married Margaret in 1988. Through the years the Longs have sold about 100 acres of their property to friends and neighbors. Thus the Longs now own only 800 acres. The Longs' Creola property is approximately three to four miles away from Courtaulds's Axis, Alabama, plant. On the property are two lakes, two large ponds, pastures, and barns. The Longs also operate a marina and a campground on a portion of the property. However, a large portion of the Longs' property is wilderness, supporting beavers, ducks, geese, deer, and other wildlife.
At trial, Buddy Long testified as follows. Before 1987, the CS2 odor emitted by Courtaulds's plant was not strong or frequent. He occasionally smelled CS2, but the smell was not a problem. After 1987, the CS2 odor became stronger and more frequent. The CS2 began causing a burning sensation in his nose and throat and prevented him from enjoying the use of his property. According to Buddy, the CS2 odor increased by 60% "in frequency and *205 in time." The CS2 odor was present whenever the wind blew from the north and whenever the air was heavy, but especially at night. The CS2 odor was so bad that often Buddy and Margaret had to leave their property. Additionally, the CS2 odor adversely affected their horses and cattle. Several witnesses who live or have lived near the Longs' property corroborated Buddy's testimony regarding the smell of CS2, particularly when the wind blew from the north and at night. They confirmed also that the CS2 odor has gotten stronger over the years. One neighbor testified that some of his horses also sickened and died.
An Environmental Protection Agency (EPA) Toxic Release Inventory Fact Sheet for Alabama reveals that in 1991, Courtaulds discharged 42,454,520 pounds of CS2 into the air, discharged 43,105 pounds of CS2 into the "surface water," and discharged 430,000 pounds of CS2 into the land. Courtaulds's 1991 CS2 discharge was more than double the combined total discharge of the nine other Alabama plants that discharged CS2.
Also in 1991, the Longs' horses began losing weight and began having difficulty breathing. Dr. Mary Brennan, a veterinarian specializing in the treatment of performance horses, performed blood tests on all of the Longs' horses. The tests showed elevated liver enzymes, which caused Dr. Brennan to conclude that a common cause affected the horses. After ruling out bacterial and viral infections, Dr. Brennan referred the horses experiencing a decline in health to Auburn University. The Longs took Rosie, one of the horses experiencing declining health, to Auburn for treatment of her respiratory problems. Veterinarians at Auburn placed Rosie on steroid therapy. While at Auburn Rosie improved, but her symptoms reoccurred when she returned to the Longs' property. Rosie eventually died.
During Rosie's decline in health, Dr. Brennan began investigating possible causes of the Longs' horses' health problems. She did not find any poisonous plants, toxins in the soil, or toxins in the water which would cause the horses' symptoms. Dr. Brennan checked the horses' feed, but found no contaminants in the feed. Because the horses' symptoms did not cease in the winter, Dr. Brennan ruled out summer pasture associated chronic obstructive pulmonary disease (COPD), an asthma-like disease, which causes difficulty in breathing, but improves during the winter. She concluded that the horses were being exposed to some toxin.
In 1992, Courtaulds recovered less than 10% of the CS2 used in its manufacturing process, and emitted over 45,000,000 pounds of CS2 into the air. Dr. Brennan moved to Georgia and ceased treating the Longs' horses. In September 1992, Dr. Albert Corte, a veterinarian who had practiced for 30 years, assumed the care and treatment of the Longs' horses. Lung and liver tissue samples were taken from one of the Longs' horses. Tests of the tissue samples revealed the presence of TTCA, a biomarker of CS2, in the liver and lung fluids.
In 1993, as a result of future emissions limitations of the Clean Air Act Amendments of 1990, Pub.L. 101-549 and 104 Stat. 2399, Courtaulds began installing new rayon spinning machines that recover CS2 and reduce CS2 emissions. Courtaulds chose spinning machines over the "carbon bed absorption" recovery technology used for 30 years by the European plants owned by Courtaulds's parent corporation. Use of the "carbon bed absorption" recovery technology by Courtaulds would have reduced its CS2 emissions by 90%. However, Courtaulds chose not to use "carbon bed absorption" recovery technology because that technology is "revenue neutral." Rather, Courtaulds chose to use spinning machines to recapture CS2 and thereby to reduce Courtaulds's need to purchase CS2. Courtaulds could not recover the cost of "carbon bed absorption" recovery technology. Courtaulds represented to the Alabama Department *206 of Environmental Management (ADEM) that the new spinning machines would reduce its emissions by 75%. ADEM communicated this information to the citizens of Mobile County who had complained of Courtaulds's accidental release of rayon fibers. However, testimony reveals the maximum recovery achieved by the new spinning machines has been approximately 50-55%.
In December 1993, Dr. Corte sent Whisper, another of the Longs' horses, to Louisiana State University (LSU) for treatment of chronic respiratory problems and for lung and liver biopsies. The veterinarians at LSU reported that Whisper had normal respiration but had summer pasture COPD. Dr. Corte told one of the LSU veterinarians that he disagreed with the diagnosis of summer pasture COPD.
In January 1994, tests of Whisper's lung and liver tissues revealed the presence of CS2 and TTCA in Whisper's urine, liver, and lungs. The tests also revealed the presence of CS2 in Whisper's blood. Dr. Corte performed blood tests on the Longs' horses experiencing breathing difficulties and weight loss. The tests again showed elevated liver enzymes. In the spring of 1994, Dr. Corte sent Whisper back to LSU for further testing. LSU sent Dr. Corte a report indicating that Whisper was in remission from summer pasture COPD.
Dr. Corte testified that he examines 1,500 or 2,000 horses in a year and that normally only two to three of those horses have COPDexcluding the Longs' horses. During the time that he has treated the Longs' horses, Dr. Corte has observed four to six of the Long's horses suffering from COPD. He testified that that number of horses with COPD is unusual. At the recommendation of the LSU veterinarians, the Longs removed their horses from their property and moved them to a property not exposed to CS2. The horses' health improved. Specifically, the respiratory and heart rates of the horses decreased to almost normal. The horses had less difficulty breathing. Dr. Corte then recommended that the Longs return the horses to their property. When the horses returned to the Longs' property, their respiration and heart rates increased and remained at an elevated rate. Additionally, the horses lost weight, not as a result of worms or bacterial or allergic infections.
Dr. Corte asked Dr. Frederick W. Oehme, a veterinarian specializing in toxicology, for advice in determining the source of the horses' health problems. Following the advice of Dr. Oehme, Dr. Corte had tissue samples taken from some of the Longs' horses. Tests of the tissue samples revealed the presence of CS2 and the presence of some its metabolites. Dr. Corte testified that CS2 is not something a veterinarian expects to find in a horse, even though in 1966 veterinarians used CS2 in combination with other products to worm horses. He stated that veterinarians, including himself, no longer use CS2 to worm horses because of its toxicity. Horses wormed with CS2 develop gastric problems, "incoordination," and laminitis. Laminitis is the acute stage of "foundering" and is the sloughing off of the hooves of a horse. A horse that develops laminitis usually dies.
In July 1996, Whisper was in very poor health. Whisper's tongue and her mucous membranes were blue, a sign of suffocation. Dr. Corte tried to relieve Whisper's suffering with various drugs. He recommended that the Longs take Whisper to LSU to have tissue samples taken again and to have Whisper checked for allergies. Veterinarians at LSU took tissue samples, which they analyzed. Tests revealed the presence of CS2 in Whisper's tissues. The LSU veterinarians sent copies of the test results to Dr. Corte. Whisper died in September 1996. LSU veterinarians performed a necropsy (an autopsy) on Whisper. During the necropsy, the LSU veterinarians took tissue samples, which they sent to Dr. Corte, who has retained the tissue samples in a freezer. Dr. Corte received also a copy of the necropsy report on Whisper. The LSU veterinarians could *207 not determine a cause of death for Whisper because Whisper's body had begun decomposing before the necropsy. Dr. Corte recommended that the Longs permanently remove their horses from their property. Dr. Corte does not believe that the Longs can humanely keep horses on their property. Upon the recommendation of Dr. Corte, the Longs leased property not contaminated with CS2 at a cost of $2,500 per year, and removed their horses from their Creola property to the leased property.
The Longs hired Dr. Oehme to determine whether CS2 caused the horses' health problems and, ultimately, caused their deaths. Dr. Oehme reviewed the test results of the tissue biopsies of Rose and Whisper; the veterinary records of all of the Longs' horses; the LSU veterinary records on Whisper; and the Auburn studies of the Longs' horses. He spoke with Drs. Brennan and Corte about their observations and treatment of the Longs' horses. Dr. Oehme visited the Longs' property; toured the area by airplane and on foot; examined the Longs' horses; "viewed their feed, viewed their husbandry, viewed how they were taken care of"; examined the horses' lungs and hearts; and observed the horses' behavior before he began a literature search of what chemicals possibly caused the horses' health problems. Dr. Oehme did not find any scientific literature discussing CS2 exposure in horses.
Dr. Oehme reviewed the deposition testimony of Buddy and of Drs. Brennan and Corte. He also reviewed OSHA's documents on the harmful effects of occupational exposure to CS2, the toxicity of CS2, and the toxicology profile of CS2. Dr. Oehme secured CS2 emissions information submitted by Courtaulds to the EPA. The EPA documents show that Courtaulds's 1991 annual emissions of approximately 43,000,000 pounds of CS2 was the highest emission of CS2 in Alabama.
Dr. Oehme testified that he looked at all the possibilities that could produce the horses' health problems. He ruled out improper feeding and fungal poisoning of the grain feed as sources of the horses' problems. Dr. Oehme then checked the horses' water for nitrates, algae, or other toxic material; checked the horses' parasite level; checked the horses for bacterial or virus infections; and checked to see if the horses' breathing problems improved in the winter. Dr. Oehme did not find any bacterial, viral, or parasite problems. He did not find that the horses had any skin allergies. Additionally, Dr. Oehme learned that Buddy did not use pesticides in his farming operations. After Dr. Oehme reviewed the test results from the tissue samples taken from Whisper and Rosie, he determined that the horses did not suffer from lead, arsenic, or copper poisoning. Finally Dr. Oehme concluded that the horses were not suffering from allergic reactions.
Upon his review of the matters set forth above, Dr. Oehme opined that the horses' exposure to CS2 caused their various health problems, including the horses' COPD, and ultimately caused the deaths of Whisper and Rosie. He admitted that he does not know the exact level of CS2 exposure which causes harm to horses but stated that an exact level of CS2 exposure is unnecessary in this case because the Longs' horses were exposed on a daily basis to small but continuous doses of CS2. Dr. Oehme stated further that the horses' continuous exposure to CS2 caused prolonged irritation in their lungs, and that the irritation caused scar tissue to develop in their lungs.
The Longs hired Robert Nauman, an analytical chemist, to test their well water, groundwater, pond water, and creek water, and to test the sediments from the ponds and creeks on and near their property. Nauman has worked with CS2 in a laboratory and has performed testing at plants which use CS2 in a manufacturing process. He is familiar with the smell of CS2 and the smell of CS2 contaminated by hydrogen sulfide. When Nauman works with *208 CS2 in a laboratory, he works inside "a vacuum extraction hood" and wears a respirator. According to Nauman, the toxicity of CS2 necessitates such safety protocols. Nauman found "a fair amount of [CS2]," "other organics like toluene," and TTCA in sediment/mud from a creek across a road from the Longs' property. He found small amounts of CS2 in soil from the Longs' property. While standing on the front porch of the Longs' house, Nauman smelled CS2, which he described as "like a sulfur-type smell ... or rotten eggs."
The Longs, Nauman, and Donald Tolbert, the chairman of the "Citizens Advisory Panel," met with David Christian, Courtaulds's vice president of operations, to discuss problems that Courtaulds's CS2 emissions caused the Longs' horses. Several weeks after the meeting, Christian telephoned the Longs. Christian and the Longs met informally at the Longs' home. The Longs explained their concerns about various chemicals, including CS2, causing harm to their animals. Buddy told Christian about some of his animals getting sick and dying. Christian testified that Mrs. Long was very upset about the sickness and the death of some of their animals. Christian suggested that the Longs hire a third party to study their horses' veterinary records to determine whether CS2 caused the horses' health problems. After meeting with the Longs, Christian instructed a Courtaulds employee to do a literature search for any scientific studies on the effect of CS2 on large animals. The employee did not find any scientific studies of the effect of CS2 on large animals. There are, however, scientific studies of the effect of CS2 on small animals and on humans.
In 1997, Courtaulds completed the installation of the new spinning machines, which reduced Courtaulds's annual emissions of CS2 to slightly less than 40,000,000 pounds. At the time of trial, Courtaulds had made no attempt to reduce its CS2 emissions other than to install the new spinning machines. Courtaulds did not monitor the concentrations of CS2 emitted by the plant "stacks" and did not monitor the concentrations of CS2 on any surrounding properties. It had permits to discharge CS2, but the EPA had not established an ambient-air-quality level for CS2.
As of the time of trial, the Longs had spent approximately $50,000 in veterinary expenses for treatment of their horses. They had spent approximately $2,500 per year leasing property where the horses can live without exposure to CS2 and the attendant health problems. The Longs presented expert testimony that their property is now stigmatized by the presence of CS2 and that the difference between the value of their property before the known presence of CS2 and the value after the known presence of CS2 is approximately $3,000,000.
A private nuisance occurs when an invasion of the property results in no substantial damage to the property, but the invasion interferes with the use and enjoyment of one's property. Borland v. Sanders Lead Co., 369 So.2d 523 (Ala.1979). See Alabama Pattern Jury Instructions: Civil (APJI) 31.50 (2d ed.1993). The defense of prescription bars recovery of damages for a private nuisance:
"1. Carried on continuously for ten years; and
"2. If the nuisance is open, adverse and continuous; and
"3. Is done with the knowledge of the plaintiff who takes no legal action to prevent it; and
"4. The nuisance for the ten year period is of the same kind and degree and produced a uniform result."

APJI 31.51 (2d ed.1993) (emphasis added). See Beam v. Birmingham Slag Co., 243 Ala. 313, 10 So.2d 162 (1942); Stouts Mountain Coal & Coke Co. v. Ballard, 195 Ala. 283, 70 So. 172 (1915); Lehigh Portland Cement Co. v. Campbell, 27 Ala.App. 130, 166 So. 727 (1936); Atlantic Coast Line R. Co. v. Harwell, 10 Ala.App. 587, 65 *209 So. 711 (1914). All four elements conjunctively are essential to the defense of prescription. Stouts Mountain Coal & Coke Co.
The Longs sued Courtaulds in 1994. Therefore, to assert the defense of prescription successfully, Courtaulds had to prove that its CS2 emissions between 1984 and 1994 were of the same kind and degree for each year during that 10 year period. Stouts Mountain Coal & Coke Co., supra. Christian, the vice president of operations, testified that in 1986, the plant emitted 30,000,000 pounds of CS2, and that in 1994, three years before Courtaulds completed installation of the new spinning machines, plant emissions of CS2 reached a peak of 45,500,000 pounds. He admitted that plant emissions of CS2 have increased and decreased through the years. This testimony shows that Courtaulds's CS2 emissions were not of the same kind and degree during the 10-year period from 1984 through 1994. Additionally, Courtaulds submitted documents to the EPA which show that Courtaulds's CS2 emissions changed on a yearly basis between 1984 and 1994. Therefore, Courtaulds failed to establish the defense of prescription to bar the Longs' nuisance claim. Shelby Iron Co. v. Greenlea, 184 Ala. 496, 63 So. 470 (1913).
Courtaulds argues also that the one-year statute of limitations in § 6-5-127, Ala. Code 1975, barred the Longs' nuisance claim. That section provides:
"(a) No agricultural, manufacturing or other industrial plant or establishment, or any farming operation facility, any of its appurtenances or the operation thereof shall be or become a nuisance, private or public, by any changed conditions in and about the locality thereof after the same has been in operation for more than one year when such plant, facility, or establishment, its appurtenances or the operation thereof was not a nuisance at the time the operation thereof began; provided, that the provisions of this subsection shall not apply whenever a nuisance results from the negligent or improper operation of any such plant, establishment, or any farming operation facility, or any of its appurtenances." (Emphasis added.)
At the time the Longs sued Courtaulds, Courtaulds had been operating its Axis plant for approximately 42 years. The Longs assert that § 6-5-127 did not bar their nuisance claim because the one-year statute of limitations does not apply "whenever a nuisance results from the negligent or improper operation," and the nuisance caused by Courtaulds's Axis plant resulted from its "negligent or improper operation."
It is undisputed that, if Courtaulds had installed the "carbon bed absorption" recovery technology used by its parent company, Courtaulds's CS2 emissions would have decreased by 90%. Rather than installing equipment to reduce CS2 emissions, Courtaulds installed equipment to capture CS2 and thereby to reduce Courtaulds's need to purchase CS2. The refusal to install or use equipment that would reduce or abate a nuisance "would properly be classed as `a negligent or improper operation of any such plant,' ... without the protective feature of the statute." Martin Bldg. Co. v. Imperial Laundry Co., 220 Ala. 90, 94, 124 So. 82, 85 (1929). See also Stone Container Corp. v. Stapler, 263 Ala. 524, 83 So.2d 283 (1955). Questions of negligence are for the jury to decide. Senn v. Alabama Gas Corp., 619 So.2d 1320 (Ala.1993). The Longs presented substantial evidence to submit to the jury the issue whether Courtaulds's emissions of CS2 resulted from the "negligent or improper operation" of its plant. Consequently, the jury could have concluded that Courtaulds's "negligent or improper operation" of its plant caused a nuisance. Therefore, I respectfully dissent from the holding that the Longs did not present substantial evidence to support their nuisance claim.
Additionally, Courtaulds does not raise or argue on appeal that the Longs did not *210 present substantial evidence to support their negligence claim. This Court will not address errors or issues not raised, or argued, in an appellant's brief. Smelser v. Trent, 698 So.2d 1094 (Ala.1997); Boshell v. Keith, 418 So.2d 89 (Ala.1982); Merchants Bank v. Cotton, 289 Ala. 606, 269 So.2d 875 (1972); Smith v. Jackson, 277 Ala. 257, 169 So.2d 21 (1964); Boles v. Bonner, 267 Ala. 342, 101 So.2d 544 (1958). Therefore, I also respectfully dissent from the holding that the Longs did not present substantial evidence supporting their negligence claim.
I also join in Justice Cook's special writing in this case.
I concur with the dismissal of the crossappeal, case no. 1972028.
NOTES
[1] We allowed the Alabama Defense Lawyers Association (ADLA) to file an amicus curiae brief in support of Courtaulds. The ADLA asks this Court to abandon the Frye test in favor of the Daubert standard. The ADLA was not a party to this litigation below. This Court "will not decide a question presented by amicus curiae which was not presented by the parties to the cause, and will leave the question for decision when properly raised and presented." State ex rel. Baxley v. Johnson, 293 Ala. 69, 74, 300 So.2d 106, 110 (1974). This issue was not raised by any of the parties to this case; therefore, we will not decide it here.