LYONS, Justice.
The appellants in this action are Pierre Chestang, Cassandra Chestang, Mattie Brooks, Timothy Johnson, Pamela Johnson, Joseph Kittrell, Beverly Kittrell, Stephen Phillips, Michael Phillips, Billy Gene Turner, and Fran Turner (hereinafter referred to collectively as “the homeowners”). They are 11 of over 160 plaintiffs who sued IPSCO Steel (Alabama), Inc., IPSCO Alabama, Ltd., IPSCO Construction, Inc., and IPSCO, Inc. (hereinafter referred to collectively as “IPSCO”), in the Mobile Circuit Court. On November 17, 2008, the trial court entered a judgment on a jury verdict against the homeowners and in favor of IPSCO. The homeowners appealed, and IPSCO Steel (Alabama), Inc., cross-appealed.

Procedural History

On July 1, 2005, over 160 residents of Mobile County (“the plaintiffs”) sued IP-SCO, alleging nuisance, negligence, and wantonness.[1] The plaintiffs subsequently amended their complaint to state additional claims of trespass and the tort of outrage. All the plaintiffs’ claims were based on IPSCO’s operation of a facility in the Axis community at which it manufactured steel from scrap metal. The complaints alleged that IPSCO’s facility made excessive noise and that it produced fumes that left a residue on the plaintiffs’ properties. IPSCO answered the complaints, and the parties engaged in a lengthy discovery process. Pursuant to an order of the trial court, the parties agreed that the homeowners’ claims would be tried in November 2008. The claims of the other plaintiffs remained pending before the trial court.
Before trial, pursuant to a motion by IPSCO, the trial court entered a judgment on the pleadings in IPSCO’s favor as to the tort-of-outrage claim. The homeowners’ remaining claims of nuisance, negligence, wantonness, and trespass were tried to a jury from November 3 to November 14, 2008. At the close of the homeowners’ case-in-chief, IPSCO moved *421 for a judgment as a matter of law (“JML”) as to all the homeowners’ claims. The trial court entered a JML as to the negligence claim and ordered that the issue of punitive damages would not be submitted to the jury. The trial court denied IP-SCO’s motion as to the homeowners’ nuisance and wantonness claims.
At the end of the presentation of IP-SCO’s evidence, IPSCO again moved for a JML as to the homeowners’ claims of nuisance, wantonness, and trespass. After extensive oral argument on the motion, the trial court entered a JML for IPSCO on the homeowners’ wantonness claim and ordered that the issue of mental-anguish damages would not be submitted to the jury. As a result, only the homeowners’ nuisance and trespass claims were submitted to the jury, and the trial court did not instruct the jury on punitive damages and damages for mental anguish. Additionally, the homeowners and IPSCO each requested several jury instructions, which the trial court refused. On November 14, 2008, the jury returned a verdict for IPSCO on the homeowners’ nuisance and trespass claims. The trial court entered a judgment on the verdict on November 17, 2008.
On December 9, 2008, the homeowners moved for a new trial on numerous grounds under Rule 50(b), Ala. R. Civ. P. The trial court denied the motion on February 6, 2009. Because the claims of the other plaintiffs remained pending, the homeowners moved for the certification of a final judgment on their claims under Rule 54(b), Ala. R. Civ. P. The trial court granted that motion, and the homeowners filed a timely notice of appeal on March 16, 2009. IPSCO Steel (Alabama), Inc., subsequently filed a notice of cross-appeal.

Factual Background

I. Background
During their case-in-chief, the homeowners presented to the jury excerpts from the video depositions of three IPSCO employees. However, the testimony presented by video was not transcribed into the reporter’s transcript. The record shows that each video deposition was stopped and started multiple times; however, the record does not show what parts of the depositions were presented to the jury. Therefore, we will not consider this testimony because to do so would require unacceptable speculation.
The evidence included in the record on appeal shows the following relevant facts. The homeowners all live in or near the Axis community in Mobile County. In 2000 or 2001, IPSCO constructed a facility in Axis at which it manufactures steel from scrap metal. Several other industrial facilities are located in the Axis community, but IPSCO’s facility is the only one that manufactures steel products. IPSCO began operations at its Axis facility in 2001. Unless IPSCO stops production for maintenance, it operates its facility 24 hours a day, 7 days a week.
The homeowners testified that, after IP-SCO started operating its facility, a dust began to settle on their properties and continued to settle and to accumulate through the date of trial. They maintain that the dust originated from IPSCO’s facility. The homeowners also testified that, beginning in 2001, they were frequently awakened by loud noises coming from the area of IPSCO’s facility. The homeowners assert that the dust and noise have damaged their property values and that they have suffered mental anguish as a result of IPSCO’s activities.
Before trial, IPSCO moved in limine to exclude evidence that it had received complaints from individuals other than the homeowners. IPSCO’s motion was not made a part of the record on appeal. The trial court granted IPSCO’s motion and, *422 by the language of the order, excluded evidence indicating that IPSCO had received complaints regarding both noise and dust from individuals other than the homeowners. However, in discussing the trial court’s ruling on the motion in limine immediately before the trial began, the trial court and the homeowners’ counsel spoke only of disallowing such complaints related to noise. To preserve the record, the homeowners submitted to the trial court IPSCO’s records of telephone calls it had received from nearby residents complaining of noise from IPSCO’s facility. The homeowners did not submit any documents showing that IPSCO had received complaints from individuals other than the homeowners of dust coming from its facility.
IPSCO also moved in limine to exclude testimony from plaintiffs other than the homeowners. The trial court granted IP-SCO’s motion and, to preserve the record, the homeowners submitted to the trial court the deposition transcripts of several plaintiffs whose claims were not then going to trial. As the trial began, however, the trial court advised the jury that the trial was part of a larger case “involving many more names and plaintiffs.”
II. IPSCO’s Operations
At its facility in Axis, IPSCO uses an electric arc furnace (“EAF”). During the manufacturing process, 100 tons of scrap metal is dropped from a bucket into the EAF, where the scrap metal is melted. Lime is introduced into the resulting liquid, separating liquid steel from lighter materials in the scrap commonly known as slag. The slag is then poured off, cooled, and crushed into a useable material much like gravel. Once separated from the slag, the liquid steel is cooled and formed into sheets.
In the EAF, the scrap metal is heated to more than 6,000 degrees, so hot that metal fumes are produced.[2] The fumes eventually cool and settle into a dust known as EAF dust. The homeowners presented evidence indicating that EAF dust is a hazardous waste. IPSCO presented evidence indicating that EAF dust is not a hazardous waste.
IPSCO’s representatives and expert witnesses testified in detail about IPSCO’s efforts to capture and control the EAF dust at its Axis facility. IPSCO’s witnesses testified that its melt shop, where the EAF is located, is completely enclosed. Based on pictures he had seen, the homeowners’ expert in environmental management, Fred Hart, testified that he believed that the melt shop was not fully enclosed, thus allowing EAF dust to escape into the environment. However, on cross-examination, Hart admitted that he had never visited IPSCO’s facility. IPSCO’s representatives testified that, in the melt shop, metal fumes rising from the EAF are captured in ducts and directed toward a bag-house where the fumes are cooled to EAF dust. The EAF dust is then either allowed to settle on the baghouse floor or is directed to an extensive series of filters that remove it from the air. Filtered air is then released from the baghouse stack. The baghouse and the baghouse stack are monitored electronically and visually by IPSCO personnel 24 hours a day, 7 days a week.
A certain amount of particulate matter is present in the air released from the baghouse stack. The parties presented conflicting evidence regarding whether the particulate matter is a hazardous waste. The homeowners’ expert witnesses testi *423 fied that the particulate matter is of the same chemical makeup as EAF dust and, therefore, is a hazardous waste that is being released into the environment. The homeowners also presented evidence indicating that a model prepared before IP-SCO’s Axis facility was built predicted that particulate matter from the baghouse stack would travel beyond the boundaries of IPSCO’s property. IPSCO’s representatives and expert witnesses testified that only a minuscule amount of particulate matter is released from the baghouse stack and that the particulate matter is not a hazardous waste. They further testified that IPSCO is in compliance with all applicable state and federal regulations regarding environmental emissions.
The EAF dust collected in the baghouse is classified by the United States Environmental Protection Agency (“EPA”) as hazardous waste no. K061 (“K061 dust”).[3] IPSCO’s representatives testified that only the EAF dust collected in the bag-house is classified as K061 because that dust is highly concentrated. Hart, the homeowners’ expert, testified that waste classified as K061 is considered hazardous because it contains chromium, lead, cadmium, and other heavy metals that are non-degradable and that can be hazardous to human health. The parties presented conflicting evidence regarding how much K061 dust IPSCO produces at its Axis facility each day; however, it is undisputed that the facility produces at least several tons of K061 dust each day it is in operation. It is also undisputed that, because K061 dust is a powdery substance, it carries a risk of wind dispersal if released to the atmosphere.
It is undisputed that IPSCO must dispose of K061 dust using special practices, most of the details of which are not relevant to this appeal. Ultimately, however, the record shows that IPSCO collects the K061 dust it produces and transports it via truck or rail to facilities specially licensed to perform disposal of K061 dust, including a facility in Emelle operated by Waste Management, Inc. (“Waste Management”). Notably, materials classified as K061 may not be disposed of by dilution; as a result, any materials that come into contact with materials classified as K061 are thereafter considered hazardous materials requiring disposal as K061.
The homeowners presented a series of e-mails between employees of IPSCO and Waste Management in 2003. The e-mails stated that IPSCO had previously expected to send for disposal at Emelle shipments made up of 0-20% soil and 80-100% K061; however, IPSCO requested that the amount of soil be increased to 40-60%. When Waste Management employees inquired as to the cause of the increase in the amount of soil, IPSCO’s employees responded stating: “[T]he waste is generated from general maintenance cleanup around the baghouse. Outside where the dust has migrated by the wind and off boots they will routinely scrape the dust from the soil. This is where the extra soil is coming from.”
The homeowners also presented over 460 shipping records generated in the K061-disposal process. Those records each contained a “waste-profile summary” that described the shipments IPSCO sent to Waste Management for disposal as 40-60% K061 dust, 0-20% debris contaminated with K061 dust, and 40-60% soil contaminated with K061 dust. The waste-profile summaries also contained printed text stating: “Excess soil is generated *424 from clean up around the baghouse. The dust has migrated by the wind and off boots. They will routinely scrape the dust from soil per [IPSCO’s employees].” Many of the 460 records also included forms that had been stamped with the term “wind dispersal.” Based on these documents, Hart opined that a significant amount of K061 dust regularly escapes into the environment from IPSCO’s facilities. Hart also stated that K061 dust and EAF dust could escape from IPSCO’s Axis facility when trucks and rail cars are loaded, unloaded, and transported from the facility.
IPSCO presented evidence indicating that the term “wind dispersal” in the shipping records was placed on those records by Waste Management and that the term referenced the potential for wind dispersal at Waste Management’s facilities, not at IPSCO. IPSCO also presented testimony that the records stating percentages of K061 dust and soil described what materials IPSCO could ship, not materials that it actually shipped. IPSCO’s representative testified that other documents showed that, of the more than 460 shipments referenced, only 11 actually contained soil.
III. Dust On the Homeowners’ Properties
The homeowners generally described the dust that settled on their properties after IPSCO began operations as grey or black and stated that it accumulated on their plants, their vehicles, and their houses. Some of the homeowners testified that the dust caused their outdoor flowers, gardens, and other plants to die. On cross-examination, however, these homeowners admitted that recent photographs of their houses showed living plants and gardens.[4] Some of the homeowners testified that the dust needed to be cleaned from their houses continually and that it made their houses ugly. Other homeowners testified that they no longer enjoyed being outdoors on their properties because of the dust.
The homeowners and IPSCO each presented extensive and conflicting evidence regarding whether the dust on the homeowners’ properties was EAF dust from IPSCO’s facility. IPSCO maintains that it captures all the dust produced by its EAF and that none is released into the environment save the negligible amount of particulate matter released from the baghouse stack. The homeowners maintain that some of the K061 dust and other EAF dust regularly escape from IPSCO’s facility and are carried by the wind to the homeowners’ properties.
The homeowners presented testimony from Dr. Wayne Isphording, a forensic mineralogist and geologist. IPSCO attempted to exclude Isphording’s testimony on the ground that it did not satisfy the requirements of Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). The trial court denied IPSCO’s motions, overruled its objections, and allowed Isphord-ing to testify as an expert witness under Rule 702, Ala. R. Evid.
Isphording testified that he collected samples of the dust from the homeowners’ properties and removed magnetic material from the dust and tested the magnetic content. Isphording concluded: “[W]hen we examine th[e] magnetic material underneath a microscope, it is identical to the material that we had as a sample of bag-house dust.” Isphording also found that the amount of magnetic material in the samples exceeded what should have been present naturally. IPSCO objected to this *425 testimony and noted that Isphording determined what should have been present naturally by referencing only locations outside the Axis community.
Isphording testified that after he finished testing the magnetic material he had removed from the dust samples, he returned them to the dust samples taken from the homeowners’ properties and sent the samples to a laboratory for a chemical analysis. Isphording then compared the results of the chemical analysis of the dust samples from the homeowners’ properties with the results of samples of EAF dust taken from inside IPSCO’s baghouse. Isp-hording testified that the EAF dust contained arsenic, cadmium, chromium, iron, lead, manganese, nickel, vanadium, and zinc. Manganese, Isphording testified, occurs naturally, but is a metal used uniquely in the steel-making process. Isphording then testified that most of the dust samples taken from the homeowners’ properties contained higher concentrations than should have occurred naturally of the metals manganese, arsenic, cadmium, chromium, and mercury, although some of the samples contained concentrations lower than should have occurred naturally. Based on his visual examination of the magnetic material and the results of the chemical analysis of the samples — particularly the presence of manganese, which Isphording characterized as a “fingerprint” of steel-making — Isphording opined that the dust on the homeowners’ properties came from IPSCO’s facility, the nearest source of a large amount of manganese.
On cross-examination, IPSCO challenged Isphording’s methodology on several bases. Specifically, IPSCO noted that Isphording combined dust from multiple locations on each homeowner’s property. IPSCO also noted that Isphording failed to follow quality-control and quality-assurance procedures and that his methods were not supported by scientific literature. Specifically regarding quality control and quality assurance, IPSCO noted that Isp-hording failed to follow certain chain-of-custody procedures and that he exposed the samples to a laboratory environment and manipulated them before submitting them for a chemical analysis. IPSCO’s expert witness, Dr. Atull Salholtra, a civil engineer and an expert in environmental modeling, stated that Isphording’s investigation was “sloppy, unprofessional, and not reliable.” Salholtra also stated: “I don’t think we can make any conclusions that are defensible based on his data ... and certainly the conclusions that he has are not reliable at all.” IPSCO also challenged Isphording’s credibility, showing that he had misstated facts when testifying before juries in two prior cases.
Based on Isphording’s conclusions, Hart testified that he believed that the dust on the homeowners’ properties was K061 dust and other EAF dust and that it got to the homeowners’ properties through the air. Hart testified that Isphording’s results showed that the metals present on the homeowners’ properties were present at levels higher than screening standards for residential soils set by the Alabama Risk Based Corrective Action program (“RBCA”) established under the Resource Conservation and Recovery Act of 1976 (“RCRA”), Pub.L. 94-580, Oct. 21,1976, 90 Stat. 2795.
IPSCO’s expert, Salholtra, coauthored the RBCA screening standards Hart relied on. Salholtra testified that the standards were preliminary and that a test result showing levels higher than those specified in the RBCA “does not mean that there is a problem. It just means that further evaluation has to be done.” According to Salholtra, in such a case the RBCA guidance document “strongly suggests that you *426 re-evaluate the situation to see if there is a problem or not because these are preliminary screening values. They are just the very very conservative values. ... It’s not proof for anybody’s opinion, ... until you go to the next level.” However, it is undisputed that additional testing of the dust on the homeowners’ property was not done, either by the homeowners or by IPSCO.
Salholtra stated his opinion that there was no evidence indicating that IPSCO had contaminated the homeowners’ properties. Salholtra stated:
“[W]e always look at the source first where the alleged contamination or chemicals are being emitted and you see what’s happening there.... And if you find at the source you do not have a problem. And when we say a problem, we mean that it is in compliance with federal and state requirements ... they are very strict standards. So if you meet those standards at the source at the origin, then you really do not need to do anything else, because that tells you that it is safe and that there is no unacceptable, no contamination being deposited anywhere in the neighborhood ... from that source.”
In late 2005, after the plaintiffs had filed suit and in response to complaints that dust from its facility was contaminating residential properties in the Axis community,[5] IPSCO hired a company known as Ambient Air Services, Inc. (“Ambient Air”), to measure the pollutants in the air near its facility. Ambient Air installed six am monitors at two locations on the south end of IPSCO’s property, toward the homeowners’ properties. The monitors measured all pollutants in the ambient air around the monitors, not just pollutants from a particular source. Ambient Air’s representative testified that from December 2005 to early 2008, the monitors did not measure any pollution levels that exceeded the National Ambient Air Quality Standards (“NAAQS”) limit of 150 micrograms per cubic meter established by the EPA.[6] See, e.g., 42 U.S.C. § 7409. However, on cross-examination, Ambient Air’s representative testified that Ambient Air did not test the chemical content of the materials collected by its filters. It is undisputed that the homeowners did not perform any air monitoring.
Based on the results of Ambient Air’s monitoring and on Salholtra’s statement that if the NAAQS are satisfied, “it is safe” and there is “no contamination being deposited anywhere in the neighborhood,” IPSCO maintained that the dust that settled on the homeowners’ properties does not originate from its facility.
To support its position, IPSCO also presented testimony and documents regarding investigations done by the Alabama Department of Environmental Management (“ADEM”). Before trial, the homeowners moved in limine to exclude the ADEM documents, arguing that they were irrelevant, immaterial, unauthenticated, and directed “toward an ultimate issue.” The homeowners also argued that a letter from ADEM to State Representative Rusty Glover should be excluded as prejudicial. Notably, there are two letters from ADEM to Representative Glover in the record on appeal; however, the homeowners’ motion did not specify which letter the homeowners sought to exclude. The trial court made the following written ruling on the homeowners’ motion:
“Any reference or suggestion to the jury that ADEM has determined that IPSCO *427 is not causing any problems as an opinion on the ultimate issue, granted as to ultimate issue.... Any reference or suggestion that ADEM has determined that there is no pollution from particulate on the plaintiffs’ properties, granted except for cross examination.”
The homeowners did not seek any clarification of the trial court’s rulings or request any standing objection to the admission of any of the ADEM documents.
Early in the trial, the first witness referenced the ADEM documents, but IPSCO did not immediately present the documents to the jury. Before IPSCO did so, the following discussion occurred between the trial court and counsel for the homeowners during an argument regarding IP-SCO’s objections to the admission of Isp-hording’s written report:
“Counsel: “Well, then let me address this. They have a letter to Rusty Glover [7] that’s not even signed by a scientist about samples that were taken at locations they can’t even identify, but has the imprimatur of an approval of a state agency in a letter—
“Trial Court: I’m going to do this. I’m going to allow that letter to be read, but it’s not going back to the jury.
“Counsel: All right.”
Subsequently, IPSCO showed the jury — and solicited testimony regarding — multiple letters from ADEM to Representative Glover, letters from ADEM to IPSCO, letters from ADEM to other individuals, a letter from IPSCO to ADEM, and an internal ADEM memorandum. IPSCO used these documents repeatedly during its cross-examination of the homeowners’ witnesses and during its direct examinations of its own witnesses. Except for the discussion quoted above, the homeowners never objected to IPSCO’s use of these documents during trial or its solicitation of testimony regarding ADEM and its activities and findings concerning IPSCO’s Axis facility. On several occasions during trial, counsel for the homeowners read from and showed the ADEM documents to the jury. Counsel for the homeowners also solicited testimony regarding ADEM’s activities.
Although it is apparent that some of the ADEM documents discussed during trial were not included in the record on appeal, the following facts regarding ADEM and its actions were presented to the jury. In 2003, ADEM received complaints regarding dust on residential properties in the Axis community. Representative Glover made inquires to ADEM concerning the complaints. In response, ADEM sent an inspector to collect samples from the complainants’ properties. A September 29, 2003, letter from ADEM to Representative Glover explained ADEM’s findings as follows:
“[ADEM] has analyzed these samples microscopically in order to identify the constituents of the material. Based on the analyses, it appears that a portion of the constituents could have originated from a steel mill. However, given the industrialization of the area and the uncertainties inherent in microscopic analysis, we cannot definitely determine at this time whether [IPSCO] is a prime source of this black dust.”
ADEM sent portions of the samples it took to IPSCO; IPSCO’s microscopic testing of the samples produced similar results.
Subsequently, ADEM installed two air monitors at the south end of IPSCO’s property to, as it explained to Representative Glover, “collect and measure particu *428 late matter in the surrounding ambient air.” On April 9, 2004, ADEM sent a letter to Representative Glover regarding its findings, stating: “The data [collected by the air monitors] indicates particulate matter concentrations at levels expected in a rural (non-industrialized) area, i.e., no excessive levels of dust indicating a contributing industrial source have been measured.” A July 19, 2004, letter from ADEM to counsel for the homeowners reported identical findings. Additionally, it is apparent from the testimony of several witnesses that ADEM wrote to Representative Glover on other occasions and reported identical findings from its continued monitoring.
IPSCO’s representatives also testified that ADEM often performed unannounced inspections of its Axis facility. IPSCO presented a February 4, 2005, internal ADEM memorandum regarding an unannounced inspection of IPSCO’s Axis facility on January 3, 2005. In the memorandum, the inspector reported that his inspection was prompted by an anonymous complaint that K061 dust was being released into the environment from IP-SCO’s Axis facility. The memorandum describes in detail the inspector’s observations and then states the inspector’s conclusions: “After completing the entire inspection, I found no evidence to substantiate the claim of hazardous wastes being released to environment.”
Before IPSCO rested its case, it requested that the ADEM documents be submitted into evidence. The following discussion then took place between the trial court and counsel for the homeowners:
“Counsel: And it was my understanding, based on arguments that were made before and during the trial, that while we could use ADEM documents to examine witnesses with, we were not going to have them go back to the jury. We objected to any of them to begin with and stand on those objections.
“Trial Court: I believe the court — my opinion was that if they contained opinions, that the opinions could be read into evidence, but that the documents themselves wouldn’t go back. And they can be used in closing arguments .... ”
Counsel for IPSCO then noted that several of the ADEM documents had been used by counsel for the homeowners in examination and noted that the documents had been displayed for the jury.
Regarding one ADEM document — a document that was not made a part of the record on appeal — the trial court stated: “I’ll allow it into evidence, but not to go back to [the jury] as a stand alone exhibit.” Regarding the other ADEM documents offered by IPSCO, counsel for the homeowners stated: “And I understand the court’s ruling on those is the same. In other words, those documents that contain opinions, they can use them in closing argument, and the opinions have been admitted into evidence, but the documents themselves with the opinions in them cannot go back to the jury.” The trial court responded: “Correct. That’s my same ruling. It will be consistent on that document, too. They are admitted subject to that qualification.” Counsel for the homeowners did not otherwise object or state any arguments to the admission or use of the ADEM documents during trial.
IV. Complained-of Noise
The homeowners testified that after IP-SCO began operating its facility in Axis, they were frequently awakened during the night by loud booming, banging, crashing, clanging, roaring, beeping, sirens, and explosions that seemed to come from the direction of IPSCO’s facility. The homeowners testified that they could hear the *429 noises clearly inside their houses and that the noises occurred both at night and during the day. None of the homeowners had complained to their physicians about a loss of sleep. Several homeowners testified that the noises were startling and that they were often scared by them. Several homeowners testified that they no longer enjoyed their houses as much as they had before the noises began.
One homeowner testified that he was awakened by the noises approximately 22 out of 30 days in March 2007. However, IPSCO presented testimony that its facility was completely shut down for maintenance from March 7 until March 21, 2007. IPSCO also presented evidence indicating that several of the homeowners live near railroad tracks and often hear noise from passing trains and that some of the homeowners are frequently awakened at night for reasons unrelated to noise.
IPSCO presented evidence from an expert witness who had measured the sounds and vibrations near some of the homeowners’ properties. He testified that he took measurements during the day and at night and that he observed a lot of activity near the homeowners’ properties such as traffic, trains, and other ambient noises. Based on his measurements, the witness concluded that there were no sounds coming from IPSCO that could be detected at the homeowners’ properties. On cross-examination, however, the expert admitted that he took measurements for only short periods.
V. Damages
The homeowners each testified that they believed that the noise and dust had diminished then’ property values significantly. On cross-examination, several of the homeowners testified that they knew that their properties were near an industrial area when they purchased them. The homeowners presented the testimony of an appraiser who estimated that the homeowners’ properties had diminished in value by 50%. On cross-examination, the appraiser testified that he based his opinion largely on Isphording’s findings and on his suppositions regarding what potential buyers might be willing to pay, not on actual home sales in the area. On cross-examination, IPSCO also noted that some new houses had been built in the Axis community after IPSCO began operations and that, after IPSCO started its operations, one homeowner had moved closer to IP-SCO’s facility.
The homeowners also testified that the noise and the dust on their properties had caused them mental anguish. One homeowner testified that she felt upset, frustrated, and alone. Another homeowner testified that he felt like the dust made his house look ugly and that he had planned to live out his life at that house but that that had changed. Another testified that she felt angry, upset, and depressed, that she felt like there was nothing she could do, and that she had once taken pride in her house but that she no longer felt safe there. Another testified that the dust and noise made him “feel like a filthy class citizen” and that he had been “dumped on.” He testified that he did not enjoy his property as much any more, that he felt “stuck,” and that he felt like the money he paid for the property had been stolen from him. Another homeowner testified that the situation broke her heart and that she would not have bought her property if she had known about the dust and noise. Several homeowners testified that they were frustrated and upset by the situation. Another homeowner testified that the situation made her feel “filthy.” She also stated: “I feel like a bomb has gone off in my life, in my heart.”

*430
Analysis

In their brief on appeal, the homeowners argue that the judgment against them and in favor of IPSCO based on the jury verdict should be reversed on several grounds. Specifically, the homeowners argue that the trial court erred 1) in admitting ADEM documents into evidence; 2) in refusing to give three of the homeowners’ requested jury charges; 3) in granting a JML for IPSCO as to their wantonness claim; 4) in refusing to submit the issue of punitive damages to the jury; and 5) in refusing to submit the issue of mental-anguish damages to the jury.[8] In its cross-appeal, IPSCO Steel (Alabama), Inc., argues that, because the claims of plaintiffs other than the homeowners remain pending before the trial court and issues regarding Isphording’s qualifications to testify as an expert witness will likely arise again when those claims are tried, this Court should overrule its decision in Courtaulds Fibers v. Long, 779 So.2d 198 (Ala.2000), and adopt the standards stated in Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993).
I. ADEM Documents
The homeowners argue that the trial court erred in admitting “various documents prepared by [ADEM]” into evidence. (Homeowners’ brief, at 22.) In their principal brief, the homeowners discuss the July 19, 2004, letter from ADEM to Representative Glover; otherwise, they refer only generally to documents generated by ADEM and do not identify specific exhibits they contend were erroneously admitted. The homeowners’ brief cites their pretrial motion, which cited numerous potential exhibits. However, many of those exhibits were either not used during the trial or, if used, were not made a part of the record on appeal. Accordingly, other than the July 19, 2004, letter to Representative Glover, it is impossible to determine precisely what documents the homeowners contend the trial court erred in admitting and the basis for any such error.
This Court has stated:
“It is fundamental that the parties have the duty to include in their briefs a statement of all facts relevant to the issues presented for this Court’s review. Indeed, Ala. R.App. P. 28 makes that duty crystal clear. Initially, the appellant’s brief must include ‘[a] full statement of facts relevant to the issues presented for review, with appropriate references to the record.’ Rule 28(a)(7) (emphasis added). Rule 28(b) requires the appellee to conform to the requirements of subdivision (a)(7), if ‘the ap-pellee is dissatisfied with [the] statements as made by the appellant.’ Also, the argument of each party must contain ‘the contentions of the [party] with respect to the issues presented, and the reasons therefor, with citations to the ... parts of the record relied on. ’ Rule 28(a)(10) (emphasis added). Where the appellee makes no correction or addition to the appellant’s statement of the facts, ‘[t]he statements made by appellant ... will be taken to be accurate and sufficient for decision.’ Taylor v. First Nat’l Bank of Tuskaloosa, 279 Ala. 624, 628, 189 So.2d 141, 144 (1966). Obviously, ‘ “this Cowl is not under a duty to search the record in order to asceHain whether it contains evidence that will sustain a contention made by *431 either party to an appeal.” ’ Braman & Guy, P.C. v. City of Montgomery, 828 So.2d 914, 920 (Ala.2002) (quoting Totten v. Lighting & Supply, Inc., 507 So.2d 502, 503 (Ala.1987)).”
Johnson v. Stewart, 854 So.2d 544, 551-52 (Ala.2002) (opinion on rehearing)(final emphasis added). See also Kirksey v. Roberts, 613 So.2d 352, 353 (Ala.1993) (“While the Court endeavors to avoid affirming judgments based on technicalities, when the Court cannot discern the merits of an appellant’s claim because the appellant has failed to articulate the claim and has failed to present authorities in support of the claim, the Court will refuse to consider the appeal, if the circumstances of the appellant’s failure make it appropriate that we do so.”).
By failing to specify which of the numerous AJDEM documents or parts thereof they contend were erroneously admitted, the homeowners have failed to articulate the issues they raise on appeal. Accordingly, except for their arguments regarding the July 19, 2004, letter from AJDEM to Representative Glover, the homeowners have not complied with the requirements of Rule 28(a)(10), Ala. R.App. P., and this Court will not consider the homeowners’ arguments.
Regarding the July 19, 2004, letter to Representative Glover, the homeowners did not object to IPSCO’s use of other documents that included nearly identical information. The trial court generally denied the homeowners’ motion in limine directed, among other things, to a letter to Representative Glover, while granting the motion only to a limited extent concerning the use of the documents. Had the homeowners’ motion in limine been granted in its entirety, no such documents could have been offered. Because the trial court granted the motion only as to the specified use of the documents, the obligation to object at trial to the admissibility of the documents for any purpose was not eliminated. Under these circumstances, a renewed objection is necessary when the documents are offered during trial. See Owens-Corning Fiberglass Corp. v. James, 646 So.2d 669, 673 (Ala.1994) (“An appellant who suffers an adverse ruling on a motion to exclude evidence, made in limine, preserves this adverse ruling for post-judgment and appellate review only if he objects to the introduction of the proffered evidence and assigns specific grounds therefor at the time of the trial, unless he has obtained the express acquiescence of the trial court that subsequent objection to evidence when it is proffered at trial and assignment of grounds therefor are not necessary.”). The only objection during trial relevant to the admissibility of ADEM’s correspondence with Representative Glover consisted of a colloquy with regard to an unspecified letter from ADEM to Representative Glover— there were two letters — in which the homeowners’ counsel noted that the letter was not signed by a scientist, that it related to samples that were taken at locations that could not be identified, and that it had “the imprimatur of an approval of a state agency.” The trial court then stated, “I’m going to do this. I’m going to allow that letter to be read, but it’s not going back to the jury.” The homeowners’ counsel responded, “All right.” We decline to speculate as to whether that objection related to the letter discussed in the homeowners’ principal brief. We therefore cannot conclude that any error in the admission of the letter was preserved in the trial court.
II. The Jury Instructions
The homeowners next contend that the trial court erred in refusing to instruct the jury as to three of the homeowners’ *432 requested instructions. Specifically, the homeowners requested that the trial court instruct the jury using the following quote from a headnote to this Court’s decision in Borland v. Sanders Lead Co., 369 So.2d 523, 523 (Ala.1979):
“Compliance with Alabama Air Pollution Control Act did not shield lead company from liability for damages caused by pollutants, i.e., lead particulates and sulfoxide deposits, emitting from its smelter and settling onto plaintiffs’ adjacent property, making it unsuitable for raising cattle or growing crops.”
The homeowners also asked the trial court to instruct the jury using the following quote from the body of this Court’s opinion in Borland:
“The Alabama Air Pollution Control Act is codified at § 22-28-1, et seq., Alabama Code 1975. [Section] 22-28-23[ (a) ], Alabama Code 1975, specifically provides:
“ ‘(N)othing in this section shall be construed to limit or abrogate any private remedies now available to any person for the alleviation, abatement, control, correction or prevention of air pollution Or restitution for damage resulting therefrom.’ (Emphasis added.)
“Alabama law clearly provides an appropriate remedy for Plaintiffs who have been directly injured by the deleterious effects of pollutants created by another party’s acts.”
369 So.2d at 526. Finally, the homeowners asked the trial court to instruct the jury using the following quote from Borland in which this Court quoted Rushing v. Hooper-McDonald, Inc., 293 Ala. 56, 59, 300 So.2d 94, 97 (1974), quoting in turn the comments to the Restatement (Second) of Torts § 158 (1965), stating:
“ ‘ “In order that there may be a trespass under the rule stated in this Section, it is not necessary that the foreign matter should be thrown directly and immediately upon the other’s land. It is enough that an act is done with knowledge that it will to a substantial certainty result in the entry of the foreign matter.” ’ ”
369 So.2d at 527.
On November 14, 2008, before instructing the jury, the trial court refused these instructions, stating:
“[T]hey are no doubt correct statements of what the law is, but they are technical discussions of the law and I don’t think they are — I think they are covered in some of the other charges, such as the fact that the act is legal does not keep it from being a nuisance. I think that’s covered. And the others seem to be more demonstrative of that.”
The homeowners did not state any objections to the trial court’s refusal of these three instructions based on language in Borland at that time.
After the trial court instructed the jury, counsel for the homeowners stated: “[Homeowners] except to the court’s failure or refusal to give [homeowners’] ... three proposed requested charges that I quoted from excerpts from J.H. Borland v. Sanders Lead Company.” However, counsel for the homeowners did not state any grounds for his exception and, in fact, did not raise any arguments regarding those instructions. Before submitting the homeowners’ claims to the jury, the trial court incorporated by reference “all of the arguments that were made in all of the discussions” that occurred between counsel for IPSCO and counsel for the homeowners on the previous day. However, the reporter’s transcript of the arguments that occurred on the previous day, November 13, 2008, show that counsel for the homeowners merely proffered the proposed in- *433 struetions from Borland and did not raise any specific objections or arguments regarding the trial court’s use or refusal to use them. In their reply brief, the homeowners cite to pages 1576 through 1578 of the reporter’s transcript. However, those pages record the homeowners’ arguments regarding other of their proposed instructions refused by the trial court; they do not record any arguments regarding Bor-land.
Rule 51, Ala. R. Civ. P., states, in part: “No party may assign as error the giving or failing to give a written instruction, or the giving of an erroneous, misleading, incomplete, or otherwise improper oral charge unless that party objects thereto before the jury retires to consider its verdict, stating the matter objected to and the grounds of the objection.”
(Emphasis added.) The Committee Comments on 1973 Adoption of Rule 51 explain:

“Under this rule, the party must, as a condition to the right to assert error on appeal, object and state grounds therefor before the jury retires. ...

[[Image here]]
“... Grounds must be stated in other than general terms but the requirement of ‘distinctly’ stating grounds as is required by the Federal Rule, has not been preserved.”
(Emphasis added.)
Based on Rule 51, this Court has stated: “[T]o preserve his argument as to the jury instruction, [the appellant] must have: (1) objected before the jury retired to consider its verdict; (2) stated the matter that he was objecting to; and (3) supplied the grounds for his objection.” Ware v. Timmons, 954 So.2d 545, 558 (Ala.2006). Regarding the third requirement, this Court in Ware explained:
‘“Requiring a party to state to the trial court the grounds for his objection to a jury instruction affords the trial court an opportunity to correct any error in its charge before it becomes error with injury to reversal.’ Coleman v. Taber, 572 So.2d 399, 402 (Ala.1990). Accordingly, ‘[g]rounds must be stated in other than general terms.’ Rule 51, Ala. R. Civ. P., Committee Comments on 1973 Adoption. ‘Although Rule 51 does not contemplate that the objecting party, in order to preserve for appellate review an erroneous instruction, deliver a discourse on the applicable law of the case, he must adequately state specific grounds for his objection.’ McElmurry v. Uniroyal, Inc., 531 So.2d 859, 859-60 (Ala.1988).”
Ware, 954 So.2d at 559.
It is apparent from the record that the homeowners have not stated with any specificity the grounds for their objections regarding the trial court’s failure to give the jury instructions based on the language from Borland. Accordingly, under Rule 51, the homeowners have not preserved for appeal their arguments regarding the trial court’s refusal to give the Borland jury instructions. See, e.g., City of Gulf Shores v. Harbert Int’l, 608 So.2d 348, 352 (Ala.1992).
III. JML on the Wantonness Claims
The homeowners next contend that the trial court erred in entering a JML on their wantonness claim. They correctly state that “[w]antonness in a trespass action is established by the mere knowledge on the part of the defendant of his invasion of the plaintiffs rights.” Cummans v. Dobbins, 575 So.2d 81, 82 (Ala.1991). See also W.T. Ratliff Co. v. Henley, 405 So.2d 141, 146 (Ala.1981); Calvert & Marsh Coal Co. v. Pass, 393 So.2d 955, 957 (Ala.1980); Ex parte Bir *434 mingham Realty Co., 183 Ala. 444, 450, 63 So. 67, 69 (1913). This Court has stated:
“When reviewing a ruling on a motion for a JML, this Court uses the same standard the trial court used initially in deciding whether to grant or deny the motion for a JML. Palm Harbor Homes, Inc. v. Crawford, 689 So.2d 3 (Ala.1997). Regarding questions of fact, the ultimate question is whether the nonmovant has presented sufficient evidence to allow the case to be submitted to the jury for a factual resolution. Carter v. Henderson, 598 So.2d 1350 (Ala.1992). The nonmovant must have presented substantial evidence in order to withstand a motion for a JML. See § 12-21-12, Ala.Code 1975; West v. Founders Life Assurance Co. of Florida, 547 So.2d 870, 871 (Ala.1989). A reviewing court must determine whether the party who bears the burden of proof has produced substantial evidence creating a factual dispute requiring resolution by the jury. Carter, 598 So.2d at 1353. In reviewing a ruling on a motion for a JML, this Court views the evidence in the light most favorable to the nonmovant and entertains such reasonable inferences as the jury would have been free to draw. Id. Regarding a question of law, however, this Court indulges no presumption of correctness as to the trial court’s ruling. Ricwil, Inc. v. S.L. Pappas & Co., 599 So.2d 1126 (Ala.1992).”
Waddell & Reed, Inc. v. United Investors Life Ins. Co., 875 So.2d 1143, 1152 (Ala.2003).
The evidence presented to the jury showed that IPSCO was aware that, at times, K061 dust was present on the ground outside the baghouse at its Axis facility and that K061 dust could travel by wind. The evidence presented to the jury also showed that IPSCO was aware, through ADEM, that nearby property owners had complained of grey or black dust on their properties. However, none of the evidence presented to the jury shows that IPSCO knew that its activities were causing an invasion of the homeowners’ rights.
The homeowners note the fact that, before IPSCO constructed its facility in Axis, a model showed that particulate matter released from the baghouse stack would disperse in the atmosphere and travel beyond IPSCO’s property. However, IP-SCO presented evidence showing that the materials released from its baghouse stack were minuscule. Accordingly, any knowledge IPSCO had based on the model is not substantial evidence of the knowledge necessary for a finding of wantonness.
The homeowners also argue that the trial court excluded other evidence showing “even more clearly, that [IPSCO] was well aware of the many complaints of excessive noise and dust being lodged by surrounding property owners.” (Homeowners’ brief, at 37.) However, the homeowners have not cited any authority to support an argument that the trial court erred in excluding this evidence. Accordingly, we will not consider that evidence in deciding whether the trial court properly granted a JML for IPSCO on the homeowners’ wantonness claim. See, e.g., Rule 28(a)(10), Ala. R.App. P.; Jimmy Day Plumbing & Heating, Inc. v. Smith, 964 So.2d 1, 9 (Ala.2007).
The cases applying the rule that an invasion of the plaintiffs’ premises with knowledge of the violation of plaintiffs’ rights supports wantonness in trespass cases are distinguishable. In Cummans, this Court explained:
“Cummans, who made no attempt to determine who owned two acres of land in the Romar Beach/Gulf Shores area of Baldwin County, Alabama, and without any permission or consent from the *435 owner of the land, went onto this land and removed (1) 30 palm trees; (2) other plants that had been planted when the lot was landscaped; (3) the sprinkler system; (4) a cedar fence; and (5) sign lettering. An industrial backhoe was used to dig many of the items out of the ground, and craters and holes were left in the land.”
575 So.2d at 82 (emphasis added). In Cummans, therefore, the evidence showed that the defendant actively carried out an extensive and invasive trespass on property without any attempt to establish ownership. The homeowners have made no such showing here.
In W.T. Ratliff, after stating the rule that “knowledge on the part of the defendant of his invasion of the plaintiffs rights” is sufficient for a showing of wantonness in a trespass action, this Court reasoned: “Obviously, Ratliff knew about the washing of sand and gravel onto Henley’s property, for testimony revealed that Henley complained frequently to Ratliffs representatives, who replied that they would take care of the problem. Thus, the submission to the jury of the wantonness count was proper.” 405 So.2d at 146. In this case, the homeowners did not present to the jury evidence of frequent complaints and ensuing frequent promises to “take care of the problem,” a response consistent with an acknowledgment of fault coupled with continued wrongdoing. No such facts are here presented.
In Calvert, this Court explained:
“This case involves numerous, separate acts of trespass on plaintiffs’ land. While the initial entries may have been negligent, subsequent entries could well have been wanton. The testimony bears this out. When plaintiffs first learned of the trespass, it could well have been a negligent action. After plaintiffs had notified defendant the next day that it was trespassing, subsequent entries on the following days could be construed as wanton.”
393 So.2d at 957 (emphasis added). In Calvert, therefore, the defendant was notified that it was in fact trespassing on the plaintiffs’ property. Although the homeowners presented evidence to the jury indicating that ADEM had received complaints of dust on properties near IPSCO’s Axis facility, notice of a complaint is not the equivalent of knowledge on the part of the defendant that it was the cause of the problem. Likewise, IPSCO’s knowledge that K061 dust could be dispersed by the wind is not sufficient to show knowledge on the part of IPSCO that K061 dust was dispersed by the wind onto the homeowners’ properties in light of the evidence indicating that only minuscule quantities were released into the environment.
Finally, in Birmingham Realty, the appellant’s complaint stated:
“ ‘That the defendant ... engaged in blasting stone and other substance ... knowing that the blasting of rock, stone, and other substances near said premises as they were doing would greatly frighten plaintiff and endanger his life, and frighten and endanger the lives of his family, ... wantonly caused said rock, stone, or other substances to be cast upon plaintiffs dwelling house, outhouse, stable and lot, garden and yard, so located on said premises, and as a proximate consequence thereof greatly frightening and endangering plaintiffs life as well as plaintiffs family....’”
183 Ala. at 445-46, 63 So. at 68 (emphasis omitted). Regarding the term “wanton” as used in the complaint in Birmingham Realty, this Court explained:
“The word ‘wanton,’ when used in a trespass complaint to characterize conduct set up by way of aggravation merely, is not governed by the rules of plead *436 ing applied to the same word when used in negligence counts. As here used, we think it imports no more than that the rocks were thrown on plaintiffs premises with a knowledge of the violation thereby of plaintiffs rights and of the injurious results therefrom, and there was evidence to support that charge.”
183 Ala. at 450, 63 So. at 69. “Wantonness,” in that context, involved knowledge on the part of the defendant that its actions would cause rocks to be thrown onto the plaintiffs’ property. In this case, the homeowners did not present evidence to the jury showing that IPSCO knew that its actions would cause K061 dust or other EAF dust to settle on the homeowners’ properties.
The homeowners, therefore, did not present substantial evidence, based on the record before us, showing that IPSCO had knowledge that it was invading their rights. Whether the cumulative effect of evidence of many complaints of excessive noise and dust being lodged by surrounding property owners other than the homeowners would tip the scale in favor of substantial evidence of IPSCO’s knowledge of not only a problem, but also a problem it had caused, is not before us in view of the homeowners’ failure to support with the citation of authority their argument that the trial court erred in excluding such evidence. Accordingly, the trial court did not err in entering a JML for IPSCO on the homeowners’ wantonness claim.
IV. Punitive Damages
The homeowners base their argument that the trial court erred in submitting the issue of punitive damages to the jury solely on the proposition that they are entitled to recover on their claim of wantonness. Because we conclude that the trial court did not err in entering a JML in IPSCO’s favor on that claim, we also conclude that the trial court did not err in refusing to submit the question of punitive damages to the jury.
V. Mental-Anguish Damages
The homeowners next argue that the trial court erred in refusing to send the question of mental-anguish damages to the jury.[9] As part of that argument, the homeowners maintain that the trial court also erred in failing to instruct the jury as to damages for mental anguish. In ruling on the availability of mental-anguish damages, the trial court stated: “[T]he court has specifically ruled that it hasn’t found the malice, insult or contumely that would open the door for mental anguish damages.” We agree.
We review this question using the same standard by which we review the trial court’s ruling on a motion for a JML, stated above. See Waddell & Reed, 875 So.2d at 1152. The homeowners were required to present substantial evidence of insult and contumely in order to submit the question of mental-anguish damages to the jury. See, e.g., Jefferies v. Bush, 608 So.2d 361, 363 (Ala.1992) (“Unless the trespass is attended with words or acts of *437 insult or contumely, damages for mental anguish are not recoverable.”); Rushing v. Hooper-McDonald, Inc., 293 Ala. 56, 61, 300 So.2d 94, 98 (1974) (“Several cases from this court have held that a plaintiff could recover for mental suffering which was the proximate consequence of a trespass to property, if the trespass was committed under circumstances of insult or contumely.” (emphasis added)); Gregath v. Bates, 359 So.2d 404, 409 (Ala.Civ.App.1978) (“Nervous reactions resulting from a tort, which is merely an injury to property as distinguished from one to the person, are in the same category as mental suffering. Unless the tort is committed under circumstances of insult or contumely, such reactions are not to be considered as proper elements of damages.... In any event, mental suffering alone, when not accompanied by malice, insult, or inhumanity or a physical injury, is not an element of damages for a nuisance. Where the tort results in mere injury to property, mental distress, or suffering is not recoverable.” (emphasis added)).
The homeowners cite Seale v. Pearson, 736 So.2d 1108 (Ala.Civ.App.1999), for the proposition that “evidence of wantonness is the equivalent under Alabama law of ‘insult or contumely,’ such as to permit the recovery of mental anguish damages.” (Homeowners’ brief, at 33.) In this case, as previously noted with respect to the absence of substantial evidence of wantonness, the homeowners have not shown, on the record before us, knowledge on the part of IPSCO that it was invading the homeowners’ rights. Absent such evidence of knowledge there is no substantial evidence of insult or contumely. This Court has stated: “‘The “known,” intentional and “willful” violation of the law and of plaintiffs’ rights in and of itself is legal insult, contumely and malice. ... ’ ” Ray Hughes Chevrolet, Inc. v. Gordon, 294 Ala. 638, 641, 320 So.2d 652, 654 (1975), quoting Parker v. Sutton, 47 Ala.App. 352, 360, 254 So.2d 425, 431 (1971) (emphasis added). Indeed, in Seale, supra, the Court of Civil Appeals noted evidence indicating that, after the plaintiff complained that small planes from the defendant’s airport flew low over the plaintiffs home, the defendant intentionally continued the low flights. 736 So.2d at 1113. Thus, the Court of Civil Appeals concluded: “The same evidence from which the jury could have determined that the low overflights were made with malice, insult, inhumanity, or contumely would support a finding that they were made wantonly or maliciously, or were attended by circumstances of aggravation.” Id. The defendant in Seale, knowing it was the cause of the harm, continued its injurious activities. The record before us does not support a conclusion that IPSCO, knowing it was the cause of the problem, continued to inflict damage.[10]
The homeowners have not presented substantial evidence that IPSCO acted toward them with insult and contumely. Accordingly, the trial court did not err in refusing to submit the issue of mental-anguish damages to the jury.
*438 The homeowners note that the trial court also remarked during a discussion of jury instructions that it had considered whether “there ha[d] been actual physical damage to a building, the castle of the person who owns it where they can no longer retreat to it that brings about mental anguish.” The homeowners argue extensively that the trial court erred in denying the recovery of damages for mental anguish on the absence of evidence of physical damage to them houses. While damage to a house resulting from faulty construction can lead to recoverability of damages for mental anguish in a breach-of-contract action,[11] we need not reach the question whether the homeowners are correct in contending that this requirement was erroneously applied to them tort claims. Any error on the part of the trial court in its remark as to the necessity for physical damage with regard to the homeowners’ tort claims is harmless in view of the homeowners’ failure to satisfy the requirement relied upon by the trial court when it refused to instruct the jury on damages for mental anguish — that there be substantial evidence of malice, insult, or contumely as to those claims.
VI. The Cross-Appeal
In its cross-appeal, case no. 1080815, IPSCO Steel (Alabama), Inc. (“IPSCO Steel”), notes that the claims of the remaining plaintiffs are pending before the trial court and that its objections to Isphording’s testimony as an expert witness as not satisfying Daubert will likely arise again in trials involving those plaintiffs. In overruling IPSCO’s objections in the homeowners’ trial, the trial court stated: “Until I see a case that overrules [Courtaulds Fibers v. Long, 779 So.2d 198 (Ala.2000),] from the Alabama Supreme Court, that’s my ruling.” Accordingly, in anticipation of the trials of the claims of the remaining plaintiffs, IPSCO Steel asks us to overrule Courtaulds and to adopt the Daubert standard.
IPSCO Steel does not argue that the trial court’s decision allowing Isphording to testify as an expert witness in the trial of the homeowners’ claims entitles it to relief. The relief IPSCO Steel seeks is prospective only, regarding a decision that the trial court has not yet made in trials that have not yet occurred. IPSCO Steel, therefore, “asks for an advisory opinion, which the Court declines to issue.” Goolesby v. Koch Farms, LLC, 955 So.2d 422, 430-31 (Ala.2006) (declining to decide an issue regarding a jury instruction “[b]e-cause the [defendants did] not argue that the alleged error entitles them to relief from an existing judgment and because it is impossible to predict whether (or under what circumstances) the trial court will give the same instruction at a new trial....”). See also Case v. Alabama State Bar, 939 So.2d 881, 885 (Ala.2006) (“[Because the facts necessary to create an actual controversy have not materialized, ... Case is essentially asking this Court to render an advisory opinion. ‘It is well settled that the judiciary of Alabama is not empowered “ ‘to decide moot questions, abstract propositions, or to give advisory opinions, however convenient it might be to have these questions decided for the government of future cases.’ ” ’ Ex parte Connors, 855 So.2d 486, 488 (Ala.2003) (quoting Stamps v. Jefferson County Bd. of Educ., 642 So.2d 941, 944 (Ala.1994)).”). Accordingly, IPSCO Steel’s cross-appeal is dismissed as being mooted by our affir-mance of the judgment in case no. 1080713.

Conclusion

Based on the foregoing, we affirm the trial court’s judgment in case no. 1080713, *439 and we dismiss the appeal in case no. 1080815.
1080718 — AFFIRMED.
1080815 — APPEAL DISMISSED.
COBB, C.J., and STUART, BOLIN, and MURDOCK, JJ., concur.

. The plaintiffs also sued Paul Wilson, John Howley, and Grant Shortridge; however, those defendants were dismissed from the action on November 10, 2008. Their dismissal is not at issue in this appeal.

. The witnesses who testified to this fact did not specify whether the scrap metal is heated to 6,000 degrees Fahrenheit or 6,000 degrees Celsius.

. See, e.g., 40 C.F.R. § 261.32(a)("The following solid wastes are listed hazardous wastes from specific sources unless they are excluded under [other sections]. ... K061 — Emission control dust/sludge from the primary production of steel in electric furnaces.”).

. Without admitting that EAF dust is on the homeowners’ properties, IPSCO also presented evidence indicating that EAF dust has been used as a fertilizer.

. The record does not include any details regarding the substance or circumstances of these complaints.

. A microgram is one millionth of a gram.

. Once again, the homeowners did not specify which letter from ADEM to Representative Glover they were referencing.

. Without citing authority, the homeowners also argue that the trial court erred in denying their motion for a new trial. Because the homeowners have failed to adequately support this argument as required by Rule 28(a)(10), Ala. R.App. P., we will not consider it. See, e.g., Jimmy Day Plumbing & Heating, Inc. v. Smith, 964 So.2d 1, 9 (Ala.2007).

. IPSCO argues that the jury's verdict in its favor cures any error in the trial court’s failure to instruct the jury on damages for mental anguish. See, e.g., Hayes v. Newton Bros. Lumber Co., 481 So.2d 1123 (Ala.1985). We need not decide whether the general verdict for IPSCO in this proceeding is consistent only with the view that the jury found no liability when the case was submitted to the jury on disputed evidence of damages unrelated to mental anguish. For all that appears, the jury found for the homeowners on liability and for IPSCO on the failure to prove damages. Instead, as explained below, we resolve the issue based on insufficient evidence of conduct that would allow the recovery of damages for mental anguish.

. In their principal brief on appeal, the homeowners do not argue or cite authority to the effect that the trial court erred in refusing to instruct the jury on mental-anguish damages as to the homeowners’ complaints of noise. The homeowners argue generally that the trial court erroneously excluded evidence of noise complaints by individuals other than the homeowners, but they do not cite authority to support that argument. Nor do the homeowners specify how admission of that evidence would have prevented an adverse ruling on this issue. Because the homeowners have not raised or supported such an argument as required by Rule 28(a)(10), Ala. R.App. P., we will not consider it. See, e.g., Jimmy Day Plumbing & Heating, Inc. v. Smith, 964 So.2d at 9.

. See, e.g., B & M Homes, Inc. v. Hogan, 376 So.2d 667 (Ala.1979).